# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CNL HOTELS & RESORTS, INC.,**

       **Plaintiff,**

-vs-                                  **Case No.  6:06-cv-324-Orl-31JGG**

**HOUSTON CASUALTY COMPANY, and
LANDMARK AMERICAN INSURANCE
COMPANY,**

       **Defendants.**

_____

# ORDER

This matter comes before the Court on the Motion for Partial Summary Judgment (Doc. 143) filed by the Plaintiff, CNL Hotels & Resorts, Inc. ("CNL"), and the responses filed by Defendant Houston Casualty Company ("HCC") (Doc. 165) and by Defendant Landmark American Insurance Company ("Landmark") (Doc. 166).  HCC and Landmark (collectively, the "Defendants") have also filed cross-motions for partial summary judgment on the same issues[1] (Doc. 168, Doc. 169), to which CNL has responded (Doc. 191, Doc. 189).

## I.    Background

In August and September 2004, two class action suits were filed against CNL.  Those suits were subsequently consolidated in a class action styled *In re CNL Hotels & Resorts, Inc.*, Case No.

---

[1] In its cross-motion, HCC makes arguments in regard to the so-called "Disgorgement Exclusion."  (Doc. 165 at 26).  This issue is sufficiently dissimilar from the issues raised in CNL's original motion that the Court declines to address it herein.  If necessary, HCC may raise this issue in a subsequent motion.

6:04-cv-1231-Orl-31KRS (the "Class Action"). The plaintiffs in that case alleged, among other things, violations of Section 11 of the Securities Act of 1933 (the "1933 Act") (Doc. 143 at 3) by way of improper accounting practices and materially false and misleading registration statements and prospectuses (Doc. 143 at 11). After protracted litigation, CNL settled the Class Action. Although not admitting liability, CNL agreed to establish a $35 million fund (the "Settlement Amount") for Section 11 claims. (Doc. 143 at 3-4). This Court approved the settlement and closed the Class Action in August, 2006.

In the instant case, CNL has sought to recover the Settlement Amount[2] and associated expenses under three liability insurance policies (collectively, the "Insurance Policies"): a $10 million directors, officers and company liability policy sold by former Defendant Twin City Fire Insurance Company ("Twin City"), and two excess liability policies issued by HCC and Landmark, each also in the amount of $10 million. (Doc. 57 at 2). On January 22, 2007 CNL dismissed its claims against Twin City pursuant to a settlement. (Doc. 164). The remaining Defendants have denied coverage on various grounds, including that the settlement payments represented a type of disgorgement, rather than an actual loss, and that so-called losses resulting from violations of Section 11 of the 1933 Act are uninsurable. CNL now moves for partial summary judgment as to the Defendants' affirmative defenses that rely on these contentions, and the Defendants seek partial summary judgment in their own favor.

---

[2]Although it appears that CNL has not yet paid all of the Settlement Amount, there is no dispute that it is obligated to do so. Because the timing of the payments does not affect the legal issues here, for simplicity's sake this opinion will refer to the Settlement Amount as having already been paid.

## II.     Standards

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).  Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments.  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

## III.    Analysis

CNL contends that (1) the Class Action constituted a "securities claim" as that term is used in the Insurance Policies; (2) the Settlement Amount constituted a "loss" as that term is used in the Insurance Policies; and (3) under Florida law, Section 11 claims are properly insurable.  For their part, the Defendants do not contest CNL's first point – that the Class Action met the Insurance Policies' definition of a securities claim.  However, they do dispute CNL's two other contentions, both of which raise a choice of law  issue that must be resolved before the substantive points may be addressed.

### A.  Choice of law

As CNL states in its Amended Complaint, the policy issued by HCC (the "HCC Policy") was a "following form" policy, "subject to the same insuring clauses, definitions, terms, conditions, exclusions and other provisions set forth" in the policy issued by Twin City (the "Twin City Policy").  (Doc. 57 at 10).  CNL makes an identical allegation in regard to the policy issued by Landmark (the "Landmark Policy").  (Doc. 57 at 10).  Thus coverage under the policies issued by the Defendants extends no further than the coverage provided by the Twin City Policy.[3]  CNL contends that Florida law governs interpretation of the Twin City Policy.  (Doc. 143 at 5-6).  HCC argues in favor of New York law, Doc. 165 at 9, while Landmark contends that the ultimate result is the same no matter what state's law applies, Doc. 166 at 1 n.1.

_____

[3]The HCC Policy also provides, in pertinent part, that it "does not provide coverage for any Loss not covered by [the Twin City Policy]".  (Doc. 165-14 at 4).  The Landmark Policy provides that it does not "grant broader coverage than would be provided by the most restrictive policy included in the Underlying Insurance."  (Doc. 166-3 at 12).

A federal district court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941).  Thus, this Court must apply Florida's choice of law rules.  In Florida, the rights and obligations of the parties under an insurance policy are governed by contract law, because they arise out of an insurance contract.  *Lumbermens Mut. Cas. Co. v. August*, 530 So.2d 293, 295 (Fla. 1988).  In determining which state's laws applies to contracts, Florida continues to adhere to the rule of *lex loci contractus*.  *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, (Fla. 2006). "That rule, as applied to insurance contracts, provides that the law of the jurisdiction where the contract was *executed* governs the rights and liabilities of the parties in determining an issue of insurance coverage."  *Id.* (emphasis added).  "When parties come to terms in an agreement, they do so with the implied acknowledgment that the laws of that jurisdiction will control absent some provision to the contrary.  This benefits both parties, not merely an insurance company."  *Sturiano v. Brooks*, 523 So. 2d 1126, 1129 (Fla. 1988).  See *also Colhoun v. Greyhound Lines, Inc.*, 265 So. 2d 18, 21 (Fla. 1972) (stating that "[W]here the last act necessary to complete the contract is performed, that is the place of the contract").[4]

---

[4]CNL argues that the court in *Shapiro v. Associated Intern. Ins. Co.*, 899 F.2d 1116 (11th Cir. 1990) held  that, under Florida law, contracts that do not concern automobile insurance "are determined by the local law of the state which the parties understood was to be the principal location of the insured risk." *Id.* at 1119-1120.  CNL misunderstands *Shapiro.*  The *Shapiro* court was making an educated guess that Florida was in the process of abandoning the "antiquated" doctrine of *lex loci contractus* in favor of the approach advocated by the Restatement (Second) of Contracts (which was the source of the quoted language).  *Id.*  Although in a subsequent case this Court felt obligated to follow *Shapiro*, *see Northland Cas. Co. v. HBE Corp.,* 145 F.Supp.2d (M.D.Fla. 2001), Florida's choice of law rules have yet to follow the path it predicted.  *See*, *e.g.*, *Roach*, 945 So. 2d at 1163 (in insurance case, stating that, "[w]e have never retreated from our adherence to [the rule of *lex loci contractus*] in determining which state's law applies in interpreting contracts.").  The Court also notes that CNL's apparent reliance on *Shapiro* runs counter to its assertion that *lex loci contractus* governs

After properly stating the general rule, CNL argues that Florida law applies because its principal place of business is here and the Twin City Policy was issued for delivery and actually delivered in Florida, because Twin City is licensed in Florida, because the Twin City Policy contains riders specific to Florida law, and because taxes were paid in connection with it in this state.  (Doc. 143 at 5 n.6).  None of these facts are relevant to the question of where the Twin City Policy was executed, or where the last act necessary to complete it occurred.  CNL cites a case that appears to equate issuance and delivery of a policy with its execution, for choice of law purposes – *Nova Cas. Co. v. Waserstein*, 424 F.Supp.2d 1325 (S.D.Fla. 2006).  However, the parties to that case agreed that Florida law applied.  *Id.* at 1331-32.  Thus the statement that CNL interprets as the Court's holding – that "Florida law applies to the interpretation of the insurance contract at issue, as the policy was issued and delivered to ... a Florida company, in Florida" – is dicta.

According to the testimony of CNL officer Brian Strickland ("Strickland"), CNL did not deal directly with Twin City but instead worked through several intermediaries, including Frank Crystal & Company ("Crystal"), which served as a broker.  (Doc. 165-13 at 4-7).  Strickland testified that it was his understanding that coverage under the Twin City Policy took effect when Crystal issued a binder.  (Doc. 165-13 at 9).  Crystal issued the binder from its office in New York.  (Doc. 165-13 at 20-23).  HCC also contends, and the evidence suggests, that after issuance of the binder, a Twin City representative signed the actual policy in New York and delivered it to Crystal in New York.  (Doc. 165-12).

_____

the choice of law for the Twin City Policy.  In any event, the *Shapiro* decision turned on the nature of the policy at issue there, which was a "comprehensive multiple risk policy covering insureds in numerous locations".  *Id.*  The Twin City Policy is not such a policy, and therefore to the extent that *Shapiro* remains viable, it is not applicable to the instant case.

In response to HCC's cross-motion for summary judgment, CNL first argues that it is the HCC Policy, not the Twin City Policy, that should be assessed for choice of law purposes. However, the HCC Policy is a "following form" policy, and its coverage extends only as far as that of the primary policy – i.e., the Twin City Policy. Thus, for present purposes, the Court must first determine which law governs interpretation of the Twin City Policy.

CNL attempts to rebut HCC's point regarding the issuance of a binder in New York by pointing out that, under Florida law, insurance binders are not, themselves, policies of insurance and generally terminate upon "either the completion or rejection of the principal policy." *Frank v. Travelers Indem. Co. of Hartford, CT*, 310 So. 2d 418, 419 (Fla. 3d DCA 1975). Though true, this does nothing to refute HCC's point that, whether one looks at the issuance and delivery of the binder or issuance and delivery of the policy as the "last step" needed to complete the contract of insurance between Twin City and CNL, these events occurred in New York, not Florida. CNL's argument that the Twin City Policy is a Florida contract because it was "issued and delivered to a Florida-based policyholder in the State of Florida" (Doc. 191 at 11-12) is not supported in the law.[5] Under Florida law, the important factor is the place of execution of the contract, not the place or places to which it was (eventually) mailed. And CNL's contention that Twin City – with whom CNL has settled – admits that Florida law applies is unavailing. Absent some evidence that

---

[5]Under certain circumstances, an insurer's notice that an insured has relocated to Florida may be one of the factors that would lead a Florida court to apply Florida law to an out-of-state policy. *See*, *e.g.*, *Gillen v. United Services Automobile Ass'n*, 300 So. 2d 3 (Fla. 1974) (applying Florida law to automobile insurance policy issued in New Hampshire to then-New Hampshire residents where clause violated Florida public policy). However, this is part of a public policy *exception* to the doctrine of *lex loci contractus*. *See Roach* at 1165-66. CNL is not making such an argument here. CNL is arguing that the Twin City Policy is a Florida contract, not that the public policy exception requires application of Florida law to a New York policy.

Florida was the place of contracting, CNL's contention that Florida law governs the Twin City

Policy is without foundation.  Twin City's so-called admission does not provide any such

evidence.[6]

Finally, in resolving an earlier motion to dismiss, this Court applied Florida law to

conclude that it was premature to litigate a bad faith claim against an insurer until the underlying

coverage dispute had been resolved.  (Doc. 113 at 2).  CNL argues that this means the Court has

already determined that Florida insurance law governs interpretation of the Twin City Policy.  But

no party had raised the choice of law issue at that juncture, and the Court made no such

determination.  In addition, under traditional choice of law principles, the law of the forum state

governs on matters of procedure, such as bifurcation of causes of action.  *Keeton v. Hustler*

*Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Siegel v. Novak*,920 So.2d

89, 94 (Fla. 4th DCA 2006) (stating that "[s]ubstantive law generally relates to the rights and

duties of a cause of action, while procedural law involves the machinery for carrying on the suit.")

(internal quotation omitted).

### B.    Would repayment of sums acquired in violation of Section 11 be a "loss"?

In pertinent part, the Twin City Policy defines "loss" as

sums which the Directors and Officers or, with respect to Insuring Agreements B(2),
C and D, the Company are legally liable to pay solely as a result of any Claim insured
by this Policy, including Claims Expenses, compensatory damages, settlement
amounts and legal fees and costs awarded pursuant to judgments, but excluding fines,

---

[6]The Court notes that the Twin City representative who made this "admission" based his belief
on the fact that "the policy had Florida mandatory endorsements", that "the litigation was in Florida,"
and that "the insured was in Florida."  (Doc. 190 at 5).  As noted earlier, these facts would not
establish that the place of contracting for the Twin City Policy was Florida.

penalties, taxes, any amount allocated to uncovered loss pursuant to Section VII of
this Policy, or matters uninsurable pursuant to any applicable law

(Doc. 143-4 at 8).  It is undisputed that, as CNL points out, CNL was "legally obligated" to pay the

Settlement Amount.  (Doc. 143 at 7).  Despite this, it does not follow that the Settlement Amount

constitutes a loss under the Twin City Policy.[7]  Obviously, the mere fact that CNL has a legal

obligation to pay a certain amount is insufficient, on its own, to compel reimbursement by its

insurers.  "The definition of the word 'loss' cannot be read to ignore the word 'loss' itself, since

doing so would completely eviscerate the meaning of the word."  *Conseco, Inc. v. National Union
Fire Ins. Co.*, 2002 WL 31961447 *12 (Ind.App. 2002).

Under New York law, it is "well-settled that a party may not insure itself against the risk

of having to return money that it has obtained improperly."  *Vigilant Ins. Co. v. Bear Stearns
Companies, Inc.*, 2006 WL 118368 *4 (N.Y.Sup. 2006).  "This is because "[r]estitution of ill-

gotten funds does not constitute 'damages' or a 'loss' as those terms are used in insurance

policies."  *Id.*, quoting *Vigilant Ins. Co. v. Credit Suisse First Boston Corp.*, 782 N.Y.S.2d 19, 20

(App.Div. 2004).  *See also Reliance Group Holdings, Inc. v. National Union Fire Ins. Co.*, 594

N.Y.S.2d 20 (N.Y.App. 1993) (return of money that was wrongfully acquired not "damages" as

that term is used in insurance policies).

---

[7]CNL attempts to buttress its interpretation of the pertinent policy provisions with deposition
testimony from the purported "principal drafter of the relevant terms of the [Twin City] Policy" and
the general counsel of NAREIT.  (Doc. 143 at 11 n.10).  The testimony seems intended to rebut the
notion that neither the Twin City Policy nor public policy preclude coverage for every type of Section
11 claim.  The Defendants object to the testimony as inadmissible.  After a review, the Court
concludes that this testimony, even if accepted as true, does not affect the resolution of this dispute.

In the *Bear Stearns* case, the court found that the defendant was not entitled to recoup a $25 million settlement payment from its insurers. *Id.* at *5. In the underlying case, Bear Stearns had consented to the entry of judgment against it in favor of several regulatory agencies, including the SEC.[8] *Id.* at *1-2. Pursuant to that consent, the court had entered judgment against Bear Stearns, ordering it to pay, *inter alia*, $25 million as disgorgement of commissions and other monies. *Id.* at *2. Bear Stearns argued that the payment did not constitute the return of improperly obtained funds because the complaint had not identified any particular sums as having been improperly obtained. *Id.* at *4. However, relying on the *Credit Suisse* case, the *Bear Stearns* court noted that disgorgement is a procedure "designed to deprive a party of ill-gotten gains and to deter improper conduct by making that conduct unprofitable" and that the $25 million payment had specifically been labeled "disgorgement" in the underlying judgment. *Id.* at *4-*5. In addition, the judgment stated that the payment was to be made as a result of the violations alleged in the complaint. *Id.* at *5. The court concluded that recovery of the $25 million payment would run afoul of both public policy and the language of the policy:

> To permit Bear Stearns to recover the $25 million disgorgement payment would allow Bear Stearns to reap the benefit of its improper behavior and defeat the purpose of disgorgement. Moreover, under the circumstances here, as set forth above, the disgorgement of wrongly obtained funds does not constitute damages as set forth in the policies.

*Id.*

The decision in *Bear Stearns* is in accord with decisions from numerous other jurisdictions. The leading case on this issue appears to be *Level 3 Communications v. Federal Ins. Co.,* 272 F.3d

---

[8] The regulatory agencies had been investigating conflicts of interest involving research analysts working for investment banks. *Id.* at *1.

908 (7th Cir. 2001), which involved a claim on a directors' and officers' liability policy by a company that had settled a securities fraud suit.  In the underlying suit, Level 3 had been accused of obtaining the plaintiffs' company under false pretenses.  *Id.* at 910.  The plaintiffs sought to recover the difference between the price they actually received for their shares and the price they would have received but for Level 3's misrepresentations and omissions.  *Id.*  Level 3 settled with the plaintiffs and sought to recover its $10 million payment from Federal.  *Id.*  Citing decisions from Illinois, the Ninth Circuit Court of Appeals, New York, California, and Alabama, Judge Posner agreed with the insurer that "a 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain."  *Id.*  In Judge Posner's words, "[a]n insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return."  *Id*. at 911.

CNL attempts to distinguish the *Level 3* decision on the grounds that the underlying suit there involved a claim under Section10(b), rather than a Section 11 claim, and that it involved allegations of fraud, none of which were present in the instant case (at least as of the time of settlement).  (Doc. 143 at 16-21).  But these are differences without distinction.  The important point in the *Level 3* case was that the amount obtained by the plaintiffs in the underlying suit "was part of Level 3's gain from its officers' misbehavior."  *Id.* at 911.  The *Level 3* court specifically noted that payments on some types of Section 10(b) claims would constitute a covered "loss".[9]

---

[9]*See id.* (stating that "[a]n example would be a fraudulent statement by a corporate officer that inflated the price of the corporation's stock without conferring any measurable benefit on the corporation.").

There is nothing in the opinion that indicates its holding is limited to Section 10(b) claims or to

complaints specifically using the word "fraud".  Other decisions make clear that the important

factor in determining "loss" is the restitutionary character of the payment at issue, not the

malfeasance (or lack thereof) on the part of the entity making it.

> [A]n insured has no greater right to something wrongfully acquired by mistake or
> accident than it does to something acquired by fraud – the critical factor is that the
> money or property does not belong to the insured, and it has to be returned.  For
> example, if a bank makes an innocent calculation error and wrongfully acquires
> funds from a customer, upon realization of the error the bank has to return the funds
> to the customer; and the bank cannot then claim reimbursement of the funds through
> insurance.  Otherwise the bank would be unjustly enriched with a windfall and
> profit from its own – albeit innocent – wrong.

*Conseco* at *11 (collecting cases and holding that payment on Section 11 claim was not a "loss").

CNL also argues that the definition of "loss" in *Level 3* was general in nature, whereas the

definition of "Securities Claim" in the Twin City Policy included a specific reference to the

Securities Act of 1933, of which Section 11 is a part.  (Doc. 143 at 14).  But the *Level 3* opinion

does not disclose whether the policy at issue there included a reference to either the 1933 Act or

the 1934 Act, which includes Section 10(b).  Even if it did not, the failure to do so is not relevant.

The decision in that case rested on the nature of the "loss" being claimed, not the specificity of the

policy language.

CNL also argues that forbidding recovery in this instance would be to "eviscerate the

express grant of liability coverage" to CNL under the Twin City Policy.  (Doc. 143 at 15).  But this

contention falls short for the same reason.  Regardless of the statute under which the original claim

is asserted, and regardless of whether the policy references that statute, if the insured is simply

being forced to return money to which it was not entitled, the event is not a loss.  It is simply not

reasonable for an insured to assume otherwise.  *See Conseco*, 2002 WL 31961447 at *15  (Ind.

Cir. 2002) (stating that it is "certainly unreasonable as a matter of law to expect coverage for

amounts an insured is being compelled to return," and collecting cases).

CNL also argues it would be unfair to preclude individual directors and officers from

recovering payments on Section 11 claims, as such individuals can be held liable even if they did

not receive any money from the purchasers of the overpriced securities.  (Doc. 143 at 20).

Although no such individual is seeking recovery in the instant case, the *Level 3* line of cases would

not preclude it.  In a Section 11 case, if an entity makes a payment that constitutes something other

than disgorgement of its own ill-gotten gains, it has suffered a loss.  *See Level 3* at 911

(recognizing, in a Section 10(b) case, that  coverage would be available where the underlying suit

involved "a fraudulent statement by a corporate officer that inflated the price of the corporation's

stock without conferring any measurable benefit on the corporation.).[10]  As such, Section 11 claims

are not *per se* uninsurable.

Finally, CNL argues that it is well-settled that under Florida law, restoration of ill-gotten

gains are "damages" that are properly covered by insurance policies.  (Doc. 143 at 22). Given the

results of the Court's choice of law analysis, Florida law does not govern on this issue.  But even if

it did, CNL is incorrect.

CNL cites two primary cases in support of this proposition.  The first, *Limelight*

*Productions, Inc. v. Limelite Studios, Inc.*, 60 F.3d 767 (11th Cir. 1995), was a trademark

---

[10]The *Level 3* court also stated that, where an officer had stolen property for the company's
benefit and the company (without knowledge of the officer's theft) had defended a suit seeking the
property's return, the company's legal expenses "would be a loss to the company not offset by any
benefit to it" and therefore recoverable from an insurer.  *Id.*

infringement case.  The prevailing party sought to garnish the infringers' insurance policies to recover its award, and the insurers objected on the grounds that recovery of "ill-gotten profits" was not covered by their policies.  *Id.* at 769.  The district court granted summary judgment to the prevailing party, and the Eleventh Circuit Court of Appeals affirmed, holding that recovery of "ill-gotten profits" was covered by the insurance policies at issue.  *Id.*

Superficially, *Limelight Productions* resembles the instant case.  However, "ill-gotten profits" under the Lanham Act are a different creature than an award under Section 11.  Within this Circuit, prevailing Lanham Act plaintiffs have the choice of recovering their actual damages or "presumed damages" – i.e, the infringer's "ill-gotten profits."  *Id.*  Recovery of ill-gotten profits is permitted because  proof of damages under the Lanham Act is often unavailable.  *Id.*  In contrast to the sums at issue in *Level 3* and in the instant motion, the profits awarded in a Lanham Act case are not being "restored" to the owner of the mark.  The profit made by the infringer does not necessarily come out of the pockets of the trademark owner.  Ill-gotten profits are awarded because they provide a yardstick, however rough, for assessing of the damages suffered by the owner of the mark.  Simply put, an award of ill-gotten profits in a Lanham Act case is restitutionary in form, but not in substance.  There is no conflict between the *Level 3* line of cases and *Limelight Productions.*[11]

The second Florida-law case cited by CNL is simply not on point.  In *International Ins. Co. v. Johns*, 874 F.2d 1447 (11th Cir. 1989), the underlying suit involved a claim by a disgruntled

---

[11]In addition, the *Level 3* court distinguished *Limelight* on the grounds that the "operative term in the insurance policy was 'damages' rather than 'loss,' and so was broader" than the term at issue in its case.  *Level 3* at 910.  This language also distinguishes the Twin City Policy from the policy at issue in *Limelight.*

shareholder that golden parachute payments were corporate waste.  The directors and officers who received the golden parachute settled the waste suit for about 20 percent of the amount of the payments they had received.  *Id.* at 1452.   The directors and officers attempted to recoup this amount from their liability insurer, which tried to deny coverage on the grounds that no "loss" had occurred, and that the insureds had not been legally entitled to the payments.  *Id.* at 1453-55.   The appellate court found that the directors had given up money to which they would have otherwise been entitled in settlement of allegations of wrongful acts, thereby satisfying the policy's definition of "loss."  *Id.* at 1454.  More importantly, the appellate court found that the golden parachute payments were legal under Florida corporate law, *id.* at 1458, and were not corporate waste, *id.* at 1469.  As such, *Johns* did not involve restoration of money which the insureds had never been entitled to keep.

> **C.      Was CNL's payment of the Settlement Amount a "loss"?**

In its motion for partial summary judgment, Landmark points to evidence that shareholders in the underlying suit purchased their stock in secondary markets at a (split-adjusted) price of $20 per share, and that a planned public offering collapsed when an industry expert opined that the shares were only worth approximately $12 per share.  (Doc. 169 at 4-5).  The plaintiffs in the underlying suits sought to recover the $8 per share difference, attributing the inflated price to the use of "materially false and misleading" offering documents in violation of Section 11.  (Doc. 169 at 5).  CNL admitted to Landmark that the overwhelming majority of the shares had not been redeemed, traded, or sold in the market, Doc. 169 at 5 – in other words, that if the share price was

inflated, CNL reaped the benefit.  In its own motion and its responses to the Defendants' motions,

CNL never contradicts or produces any evidence to rebut these factual allegations.[12]

In sum, then, the Court concludes that the Settlement Amount represents CNL  being

compelled to return money that it wrongfully appropriated.  *See Level 3*, 272 F.3d at 910-11.  As

such, based on the foregoing, the Defendants are entitled to a partial summary judgment that the

Settlement Amount is not a "loss" as that term is used in the Insurance Policies.  *See, e.g.,*

*Conseco*, 2002 WL 31961447.  The Defendants are also entitled to a partial summary judgment

that the Settlement Amount is uninsurable under New York law.  *See, e.g., Bear Stearns* at *4

(N.Y.Sup. 2006).

## IV.    Conclusion

In consideration of the foregoing, it is hereby **ORDERED** and **ADJUDGED** that the

Motion for Partial Summary Judgment filed by Plaintiff CNL Hotels & Resorts, Inc. (Doc. 143) is

**DENIED**.

And it is further **ORDERED** that the motions for partial summary judgment filed by

Defendant Houston Casualty Company (Doc. 168) and Defendant Landmark American Insurance

Company (Doc. 169) are **GRANTED IN PART** and **DENIED IN PART**.  To the extent that

those motions seek rulings that the Settlement Amount 1) does not constitute a "loss" as that term

---

[12]In the Class Action, this Court awarded plaintiffs' counsel 20 percent of the Settlement Amount for attorneys' fees. In its reply to Landmark's cross-motion, CNL argues that under *Level 3*, this $7 million could not constitute restitution, because CNL had not received any money from plaintiffs' counsel in the first place. (Doc. 189 at 14). The Court finds no merit in this argument. The $7 million was a part of the sum that CNL disgorged to settle the Section 11 claims in the Class Action. The fact that the plaintiffs had to use some of that money to pay their attorneys does not alter the character of CNL's payment, which was clearly restitutionary.

is used in the Insurance Policies and 2) is uninsurable under applicable law, they are **GRANTED**.

To the extent they seek a ruling that the "Disgorgement Exclusion" precludes coverage of the

Settlement Amount, they are **DENIED WITHOUT PREJUDICE.**  To the extent that they seek a

ruling that Section 11 claims are *per se* uninsurable, and in all other respects, they are **DENIED.**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 14, 2007.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party